hearing. The United States Court of Appeals is for 11th Circuit is now opening according to law. God said the United States and it's out of the court. Good morning. Welcome to the 11th Circuit Court of Appeals. We're proceeding today by zoom because of the hurricane situation in the middle of the state. And we're thinking of all of the people who have been in the hurricanes path and hoping they're all safe and that they have not not experienced significant damage. Um, we're gonna go ahead with today's arguments that we have scheduled. First up, we have Ashraf versus United States Drug Enforcement Administration. We'll hear first from Mr. Ashraf. I'm sorry, Dr. Ashraf. Audio on. Thank you. Dr. Ashraf, your audio is off. There you go. Yeah. Okay. I'm gonna I'm ready to start now. Yes, please go ahead. First of all, good morning to everybody. And I would like to say thank you because this is my pleasure to be here. And again, thank you. You want me to just say what basically is the issue, right? Or you're gonna be asking questions, right? You'll you'll go ahead and tell us whatever you want us to hear. And if we have questions, we'll go ahead and ask. Anyway, this is my first time. As you know, I'm a physician, not a attorney or lawyer. This case is started in 2017. I was working in the medical office of a lady by name J. L. I should I'm sorry to interrupt, Doctor. I just want to let you know that we have reviewed all of the papers that have been filed. We are familiar with your case. You can talk about whatever you want to. But if the reason you're telling us the background is to make sure we know about it, we already do. Okay. So basically, I will start from the issue off the diversion investigator, Peter Flagg. So when he came in for the first time, as he met with me, first thing he said, you should surrender the license. And I told him, why should I surrender the license? I never did anything wrong. Then he said, if you don't do it, we will make sure that the judge at the D. A. Will do it. So his inter encounter was already harsh. And as the case progressed, he kept doing things which was pretty much obviously not right when he not succeeded in getting what he wanted. He formatted declaration and that is under penalty of perjury. And he put down multiple allegations. And that declaration was used by the drug administration in their judges and the administrator just to point out how falsehood that declaration was under the oath and under the penalty of perjury. In paragraph 14, he said that I have been asking Dr Ashraf to produce the medical files and the reason he needed the medical files is to judge the prescriptions are genuine because according to the law, prescription is legitimate. If it is written for a legitimate medical purpose by a physician working or acting in his usual course of practice, there was excuse me. I'm sorry. Excuse me, Dr Ashraf. I just want to let you know that we are charged with reviewing the record as it exists and the factual findings of the D. A. And unless they're not supported by substantial evidence, that's what we that's what we have. And so what we need you to do is to explain to us why, based on that record, the decision that the D. A. Administrator made was arbitrary, capricious or an abuse of discretion or otherwise not in accordance with the law. Um, and so I just want to make sure you're aware that that's what we're considering. So you have a chance to hear your argument towards that. So their decision was arbitrary, capricious because it was all lied. He is saying that Dr Ashraf is not producing the medical records. He knew that medical record was taken by the police, by the book condition of office. He was himself there. So if he is so. So, Dr Ashraf, I think that what the record is saying in this case is that, um, specifically, they were looking for the records of J. L. And jail's family members and that there were no medical records for those individuals because you had said you never actually saw them. And so, um, and so even though the D. A. Took records from the practice, those records couldn't have been among them because they never existed in the first place. And and that is that is what we have to deal with in the record. That is what the record says. Um, so that is the basis on which the administrator ruled. And that's why we need to know if there was some something arbitrary, capricious and abusive discretion or otherwise not in accordance with the law in that ruling. For example, he says that I saw those patients. The only person I saw was J. L. I didn't met any time her husband, so there couldn't be any record. I didn't even know that she had a son, which was there. I didn't know. Also, those records were never there. When the records were confiscated, her record went with that, and they are saying they never took any medical records. See the word any medical records. So they are not telling the truth. Police took it, and now they are saying they never took it. So that's also not right. Then he says that I never responded to the order to show cause, and I did respond in the timely fashion. So this is also his line. So those two important factors. Then he goes on telling so many other things that I was not responding to the subpoenas. He himself told me not to come for the meeting. So that's also tells you that he's not telling the truth. His line. So all those factors amount to me to suggest that the administrator and the judge relied on his statements, which is under the perjury off law, and he's not telling the truth. So if he's not telling the truth, then the decision is also not right. And Miss Anita Gay also said that Dr Asher responded after six months. I responded within the time, which is 33 days. And then they go on telling so many other things that they were not part of it. The other thing when the letter came, the issued letter for the order to show cause, they said they will treat my case as the standard of McKay. Dr McKay case was intentional that there was an element of intention in my case. They never proved that I had any intention. There was absolutely not the prescriptions. So there are the prescriptions, and I realized that, um, the knowing or intentional argument you're raising might apply to that. But it does appear from the record that you admitted that your inventory was not up to the standards the D. A. Set and that your record keeping and your reporting also was not or were not in compliance. So what can you say regarding the evidence in the record that did support your awareness that those requirements were not being satisfied? I told him when he came in, if you want to look at the inventory or if you want to look at the records, I pointed out to him to the cabinet where everything is kept. He says, No, it doesn't need to look at those records. I asked him and he says, No, he doesn't need it. But do you? So are you denying that your records were not in proper order? And are you denying that you didn't comply with the reporting requirements as the D. A. Imposed? Which reporting? Well, the record shows that there were a number of instances where again, you were not logging your inventory that it seems that there were drugs that you could not account for in your inventory, that there were reporting requirements regarding your operation of the clinic that you had not provided again. Are you saying that all of that evidence was not accurate against? No, the monitoring is not necessarily done by the doctor. The staff can be able to do it. When I started the practice, the manager, J. L. Promise that she'll be reporting it to the data reporting, which is the Florida prescription. And she did not do that part. That is not by the doctor. The staff can do it in terms of the inventory and everything was up to date. And I told him this is where they all are. He says he doesn't need to look at it. And that when the whole system was taken by the police from the reports, the stationeries, the computer, everything was gone. I didn't have anything left. I mean, but wasn't there a discrepancy of about 25,000 pills that were missing of the no, no, no, no, no, no, no. They were not missing. We had thousands of patient and those were given those prescriptions. Those were not. They were stolen. This medicine has no street value. First of all, the other thing patients were uninsured because they couldn't take the insurance for the weight loss. So they were seen and I was giving it to them as a part of the treatment. No, there was no such thing. All right, let me ask you one other question. Then, um, one of the things that the D. A. Has found a problem with is that, um, you conceded that you had signed blank prescriptions and given those blank prescriptions to J. L. Um, and let me explain you this thing. As a doctor, as a physician doing emergency cardiology, we have to rush to the hospital that day. Emergency comes, I go and I don't give her the authority to write for herself. It was for the patient who will be coming in and those patients will be given as per my permission, my authorization. And there were two prescriptions because of the emergency. Not that I give hundreds of prescriptions signed. Did you give her signed prescriptions? Yeah, there were two prescriptions because I had to rush to the hospital for the emergencies. I'm a cardiologist and that basically, but I didn't authorize her to use those for herself. Those were the patient. When the patient comes in, I talked to them on the phone and then tell her that's a very practiced by other doctors. Also in emergencies. All right. Thank you, Dr Ashraf. You've reserved five minutes for rebuttal, so we will hear from you again after we hear from Miss Gay. Thank you, Your Honor. Good morning. May it please the court. I need again on behalf of the Drug Enforcement Administration. As the court noted, the inquiry before the court is whether the D. A. Administrator's final order revoking Dr Ashraf's D. A. Registration, authorizing him to dispense controlled substances was arbitrary and capricious and whether it's supported by the evidence. I would like to briefly also discuss his claim of a due process violation and point to areas of the record that showed that he was given an afforded full process. He was not deprived of any due process. He received the order to show cause that was issued in September, September 21st of 20, September 30th of 2021. And after he received that within a within a timely fashion, he did submit a corrective action plan. He never requested a hearing. He never requested a hearing at any point in this process, but he did submit a corrective action plan and there he had been instructed in the order to show cause to fax it to the D. A. Assistant Administrator or actually to email it to the assistant administrator. He did not do that. Rather, he mailed it to the chief counsel's office to the trial to the government attorney who would prosecute the order to show cause. Um, it was during the pandemic. There were there were delays in physical mail. Um, there were also people not working in the office, working remotely. So for whatever reason, um, Mr Man, the trial attorney for D. A. Did not receive it for several months. But once he did receive it, which was in April of 2022, he promptly sent it over to the assistant administrator who reviewed it. And then a week later advised Dr Ashraf that D. A. Was denying his corrective action plan. So, first of all, he was not in any way penalized for them not seeing his corrective action plan within the 30 day time limit. He submitted it timely. There was no, there was no infringement on his access or his ability to have his position heard. But also, when you look at his corrective action plan, it it does not in any way except responsibility for his misconduct, for his failure to comply with the Controlled Substance Act, federal, state laws and regulations. What it all it states is that I will keep my prescription pad locked up going forward. I won't let anyone have it. And I also won't share passwords with people because he also shared passwords with J. L. So she could she could register people for the state of Florida Medical Marijuana Registry, which again is not a C. S. A. Violation under the D. A. Regulations. But it just shows that that she was acting and and performing as a physician when in fact she was not even a nurse. She ended up being arrested and prosecuted for that. I just want to point out one quick one one time issue when when Dr Ashraf referred to the diversion investigator coming to visit. That was on July 26 of 2017. He did visit that day. He asked for medical records, asked for the dispensing records and didn't conducted an inventory. So, um, there there two, I guess, silos of of prescriptions that the court would want to look at here. One is the 33 prescriptions to J. L. Her husband and her son. And then the other one, the other one is the fentanyl that he either prescribed, but more importantly that he dispensed directly in the office. And as a practitioner, he was authorized to do that. But what he had to do was he had to maintain all these additional records for that. So when the diversion investigator visited in July of 2017, he did an inventory and it showed up that the fentanyl on hand was missing 30 pills. They found another bottle. So actually the inventory that day was fine. What was not fine and what you what you refer to Judge Rosenbaum was the 20,000 fentanyl. So they had been dispensed, but there was no record of when or where or how we don't know what happened to those. Do we? No, we do not know. They just went right. They went. I mean, Dr Ashraf said he would give them to patients who did not have insurance. Presumably they would pay cash for them. But again, there there are strict records that are required by the D. A. And the state of florida. And it's a schedule for controlled substance. That is the only controlled substance that he had on hand in the office. He had other prescription medication, but he there were several other regulations that he failed to comply with with respect to the fentanyl, the initial inventory, the dispensing records. He did not keep it locked in a secure, well constructed cabinet. In fact, he admitted that jail would take the controlled substances. She would take the fentanyl home at night when the clinic was closed. When there was a theft of 14 bottles of fentanyl, they reported it to the police, but not to the D. A. Within one day as they were required. So if he what he said to the diversion investigator later was that he's not responsible for complying with any any requirements about the legitimacy of the 33 prescriptions because J. L. Was just had gone rogue and did those on her own. But even excluding that there is ample and sufficient evidence to support the administrator's decision. What I wanted to point out on the timing is that the diversion investigator visited prior to the execution of the search warrant by the Polk County Sheriff's Office. That was nearly a year later on June 12 2018. So this position that all of his records had been seized during a raid, um, is false because, first of all, it was a search warrant. But secondly, it was after the diversion investigators initial visit, and the diversion investigator stated that when he asked for for forms and documents to justify prescribing, Dr Ashraf gave him a blank form that he would give to new patients to fill out and and did not have physical or electronic records to submit. I mean, to show to the diversion investigator to explain where where these 20,000 dosages of fentanyl had gone and why. And so they were not legitimate prescriptions. They're also not in accordance with all of the statutory requirements. Um, I I was going to address the Rwanda issue. I don't know if the court has questions or would like to hear. Let me just ask you one question if you don't mind. Dr Ashraf has alleged that the investigator lied on. I wonder if you can just respond to how, if at all, that affects our analysis. Uh, well, he he says that the investigator lied because because the records had been taken and that the investigator knew that because he was present during the search warrant. Um, and he may have been present during the search warrant. But again, that was after his initial his initial, um, inspection where he showed up with the D. A. Inspection notice and conducted the inspection a year before. So he he did not lie. I mean, there's no what he what he says is, is that the investigator told him I don't need the records. Well, that was also interesting because he points to at the end of the supplemental reports that he he filed with his initial brief. There is a an email, um, to Dr Ashraf saying don't come to the office. Ironically enough, because of bad weather and a hurricane, I believe. But it was just that one day he said, I don't need you to come to the office. But the investigator never said to him, You don't need to maintain these records. You don't need to. He definitely looked everywhere and thoroughly trying to find the records for where did the 20,000 dosages of fentanyl go? And he also questioned Dr Ashraf about this position that J. L. Was just off on her own because he said he said to the investigator as well as to the sheriff's deputy. Um, when he was asked about, did you pre sign these prescription pads? He said, well, not too, not too many. And he said maybe four or five pre signed. And the detective responded. And this is in the certified record that was filed by the D. A. At page 1 65. The detective said he had already found 15 to 20 pre signed prescriptions already. Um, he also acknowledged giving jail prescriptions for oxycontin with acetaminophen, which is percocet, a two drug when she had headaches. He also remembered that he had prescribed ambient to her. So for him to now say that of the 33 prescriptions, he had nothing to do with those is inconsistent with his statement. Um, and if as far as the due process, he wanted to submit additional police reports that he did file with the brief. But when you look at those reports, they do not help his case at all. They do not show that he was complying with his obligations as a registrant to keep the closed system required by the Controlled Substances Act. What they show is that four patients were interviewed. Three of them said they had never even seen Dr Ashraf at the clinic that they obtained prescriptions for fentanyl from J. L. That she performed medical procedures on them when she was not a medical, not a um, so I don't know if that answered your question. Judge show five. I just want to make sure. Okay. Um, just very briefly on the one issue, the Sixth Circuit in an unpublished decision and faced with this very issue of a doctor whose revocation to prescribed controlled substances as a D. A. Registrant had been revoked. Um, in the Sixth Circuit stated that Rwan does not apply to administrative proceedings. There have been a couple of civil penalty cases under the Controlled Substances Act that are also cited in our brief that held that it does not apply to that. And what I would also point the court to is if you look at the order to show cause the allegations in the order to show cause, which is akin to an indictment, set out the violations under 1306.04 for not issuing legitimate scripts and the various regulatory sections I just talked about about the inventory, dispensing records, locked cabinet reporting theft. But there is not a mention of 841. There's not a mention of 21 U. S. C. Section 8 41, which, as the court is aware, is the criminal statute for illegally distributing controlled substances or narcotics. Um, so the allegations in the order to show cause were not criminal. The order to show cause is not based on a criminal diversion. And again, as I stated before, even if you do disregard those 33 prescriptions, there is more than ample evidence to support the administrator's finding. Um, I mean, Dr Ashraf was the only position at this clinic. It was a weight loss clinic. It was J. L. Was the manager and the registered agent. He was the only physician who was there, but he also had a separate practice. And when the detectives did surveillance, they rarely saw him at the clinic. He gave a lot of authority to J. L. That that, um, abrogated his his responsibilities and obligations as a registrant. You may maintain the legitimate and illegitimate dispensing of controlled substances. Um, accordingly, based on the evidence that's presented and the prior agency policy and precedent, we would ask this court to deny the petition for review. Mhm. All right. Thank you, Miss Gay. And Dr Ashraf, you have reserved five minutes. Thank you. A few things in the order to show cause the Brian Besser, who basically wrote or issued the order to show cause. He indicated that my case will be judged based on McKay, where that will be intentioned. But the D. A. Change it to administrative and procedural, and they did not follow what the order was. The show cause Dr Ashraf. The whole idea with over the order to show cause to have you come before the agency, as it were, and explain why the order is inappropriate. I mean, they're just asking you for an explanation, and you didn't give them any. No, I wrote the corrective action. Five months later, you submitted something that didn't respond to the order. I wrote within 33 days the corrective action plan if they didn't get it. And I use the address which they gave it to me for Mr Francis man and Brian Besser. I use exactly those words. Overnight I shipped it to the agency. I didn't delay any of those. And corrective action plan was one of the option, and I used that option. I did not delay anything. Well, but I believe Dr Ashraf. The concern is that in your corrective action plan, there was no acceptance of responsibility. And perhaps the D. A. S. Perspective is that if you're not even acknowledging that you committed an error, then how can there be any confidence in your proposed changes? I mean, there's a reason why these changes are necessary. And perhaps what the D. A. Was looking for is some acknowledgement on your part that you had made some errors. I did not do it anything wrong. I told them the only thing my prescription pad was not with me. It was in the office locker, and she had the access, and I will use my own prescription pads in my locker with me, and it will never go to anybody else. Other than that, I did not do anything wrong. Now they're asking me to admit liability, accept the responsibility, which is not right. They're forcing me to do something which I did not. And again, if that description pad was the issue, I told them I'll keep it with me all the time. Now I do that practice. There has been many other issues. In terms of the prescription writing to her, I did not write anything other than the Ambien, which I said before, and I'm saying now, Berko said and all those things, she forged it to herself and to her family, and I never met her family. I didn't even know that she had a son. This is what she had maintained, and I never met her husband, so how could I write a prescription when he never came to the office? Regarding the records, they took 12 boxes of medical records. Then to say there was no medical record, the cabinet was filled with the patients. Every inspector who wrote it down from A to Z, she knows that, and Peter Flagg, the divergent investigator was there, and from the Department of Health, they were there, and then they said, no, we didn't take any record. They took every record, and then to say they didn't take, that's a lie. That's why I've been saying that they were lying. They did not tell the truth, and Miss Anita Gay is trying to sober it down or water it down or to make it look like, oh, no, there was nothing done wrong. That is absolutely wrong. They took the records, and now they're blaming me that I was hiding it. He knew that, and he's the one who said, don't come. Then he tells me in an email, don't tell anybody, this investigation, keep it quiet. I mean, why he is doing those kind of things when I should be getting help? And Miss Gay is trying to cover it up. The administrator used all the evidence which he submitted regarding the lock. When the police came first time in the theft, they took the fingerprints of the door where is a separate cabinet. So why would they be taking a fingerprints when there is no separate locking system? There was a locking system, and they took the fingerprints out of that separate closet. Then to say that I wasn't keeping the records and this medication, 24,000, when missing, no, they were giving it to the patient. I was trying to help the patient by getting it rather than they're buying it from the pharmacy. I didn't make any money out of this practice. In fact, if anything, now I'm living in a rental property. I had to sell my house. I don't have any money because of that to blame me that I was holding the money, seeing patient which has no insurance. Those who are on the weight loss do not get insurance because the insurance company denied that thing. And the only prescription I wrote for her was the Ambien because she says her husband is abusive. He beats her up. She can't sleep. So I wrote for that. Other than that, she wrote by herself. All right. Thank you, Dr Ashraf. We appreciate your argument. We think we have your argument.